UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAURIE MCCANN,

        Plaintiff,

                                         Case Number 06-13150-BC
v.                                        Honorable Thomas L. Ludington

MIDLAND COUNTY EDUCATIONAL
SERVICES AGENCY, CLARK VOLZ,
VICKI DUSO, and JEFFREY CLARK,

        Defendants.
_____ /

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff alleges that Defendants terminated her employment in retaliation for reporting improper accounting procedures to a state auditor. On September 26, 2007, the Court held a hearing on the parties' cross-motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c).

I.

Plaintiff Laurie McCann ("Plaintiff") served as the accounting supervisor of Defendant Midland County Education Services Agency ("MCESA"). As such, Plaintiff was required to maintain accounting records for all federal, state, and local programs. Defendant Clark Volz ("Volz") was MCESA's superintendent, Defendant Vicki Duso ("Duso") was MCESA's director of finance, and Defendant Jeffrey Clark was MCESA director of human resources.

In late 2005, MCESA terminated Plaintiff's employment after sixteen years as an accountant at MCESA. Defendants contend that they terminated Plaintiff's employment because of her inappropriate conduct and a breach of trust. Plaintiff contends that her termination was in retaliation for reporting spending irregularities of federal grants to a state accounting agency. As a result, Plaintiff filed the instant suit.

Plaintiff alleged three causes of action in her complaint. Plaintiff's first cause of action, brought pursuant to 42 U.S.C. § 1983, alleges violation of her rights under two distinct theories. She contends that her termination violated her First Amendment right of freedom of speech and her right to due process of law under the Fourteenth Amendment. Plaintiff's second cause of action relies on Michigan's Whistle-blowers' Protection Act ("WPA"), which provides a private right of action to redress an adverse employment action taken as a result of an employee reporting a violation of law. See Mich. Comp. Laws § 15.362 (1981). Finally, Plaintiff claimed breach of contract contending that her termination violated the terms of the employment contract. Specifically, Plaintiff alleges that Defendants terminated her without just cause, without the requisite due process, and in violation of Defendants' longstanding policies and customs.

The dispute arose when Plaintiff became concerned that an MCESA expenditure might possibly violate federal regulations or an applicable collective bargaining agreement. MCESA employees were recipients of a benefits plan that included health coverage. Included in the health coverage for an employee, was conditional coverage of the employee's spouse, depending on whether the spouse had available coverage from the spouse's employer. If health coverage was available from an independent source, then the spouse was not eligible under MCESA's plan.

According to Plaintiff's deposition testimony, at the end of 2004, MCESA employee Jane Doe and her spouse, John Doe, were recipients of the aforementioned health coverage plan. At that time, John Doe was not employed and covered solely as Jane Doe's spouse under MCESA's benefits plan. In January 2005, MCESA hired John Doe as a substitute teacher, a semi-permanent position. John Doe did not elect to enroll in the benefits plan under the terms of his employment contract, but continued to receive health coverage via Jane Doe's benefit package. In lieu of individual health coverage provided by his individual employment contract, John Doe received a $513 monthly payment. MCESA's health benefits were partially subsidized by federal and state grants. A portion of the payment to John Doe came from the federal grant money. As accounting supervisor, Plaintiff became concerned that the payment in lieu of coverage possibly violated federal grant rules or the relevant collective bargaining agreement as an illegal expenditure. Although not immediately germane to the questions before the Court, the parties' papers are not at all clear in explaining the merits of Plaintiff's accounting concern.

Upon discovering what Plaintiff believed to be the irregularity in February of 2005, she telephoned Norm Lupton ("Lupton") of the Michigan Department of Education. In the past, Lupton had audited MCESA's expenditures. Plaintiff initially called Lupton to "figure out how to correct the problem that [she] discovered" and Plaintiff agreed that the initial call to Lupton was an "inquiry." *Plaintiff's Deposition* at 18:23-24, 22:15. Plaintiff's immediate supervisor, Duso, was aware that Plaintiff inquired about the benefit plan "irregularity."

According to Plaintiff, Lupton advised her that Jane and John Doe's health benefits constituted a violation of federal grant guidelines. Lupton suggested that the benefits expenditure needed to be individually approved by MCESA's board of directors and paid with money other than

federal grant funds. Plaintiff had also testified that Lupton informed her that if she approved the payments she would be committing fraud. Plaintiff informed Duso of Lupton's opinion, however, Plaintiff testified that Duso did not take corrective action.

In March of 2005, Plaintiff again called Lupton[1] to discuss her legal responsibilities as an accountant and the consequences of approving an inaccurate financial report. After the conversation, Plaintiff informed Duso that she called Lupton to "report" the illegal payment and Defendants' inaction in correcting the payment. *Id.* at 57:13. At this point, Plaintiff retained counsel for independent consultation regarding her personal liability for conspiracy to commit fraud. In the consultation with her attorney, Plaintiff's primary concern was to take the correct action "as an employee." *Id.* at 67:7. Plaintiff informed Clark about her report to Lupton in late February or Early March of 2005. Again, Defendants did not take corrective action and Plaintiff believes they stonewalled any further attempts to discuss the violation with her.

In August of 2005, MCESA was preparing its financial reports for the 2004-2005 fiscal year. As part of her duties, Plaintiff needed to approve the report and "sign-off" on it. At that point, Defendants had not fully addressed Plaintiff's concern over the alleged "illegal payment." As a result, Plaintiff refused to sign the report.

On September 16, 2005, Volz, Duso, and Clark held a meeting with Plaintiff. According to Defendants, they informed Plaintiff that they no longer trusted Plaintiff to effectively perform her duties and that she had performed some of her duties in an unprofessional manner. Additionally, Defendants charged that Plaintiff had run her department's computer systems in an insecure manner.

---

[1] According to Lupton's deposition, he only recalls a single phone conversation taking place regarding the expenditure in question. Though he only recalled one phone conversation, he believed it was possible that there were more telephone conversation with Plaintiff regarding the expenditure.

As a result, Defendants decided that she would be terminated.  Defendants offered to pay Plaintiff

$14,000 in exchange for her  waiver of any future right to make claims against Defendants.  The

waiver stated:

> In signing this Release, Employee acknowledges that:
> 1.  She has been advised to consult with an attorney before signing this Release.
> 2.  She has been given at least twenty-one (21) days to consider the Release, although she may voluntarily execute the Release in less than 21 days.

Plaintiff refused to sign the release.  Plaintiff disputes that Defendants expressed their justification

for her termination at that meeting.

On September 26, 2005, Volz placed Plaintiff on administrative leave and provided her with

written justification detailing Defendants' basis for Plaintiff's  termination.  The letter stated in

pertinent part that:

> I requested a meeting with you on September 16, 2005 to discuss some concerns I had about you in your role as Accounting Supervisor.  Also present at that meeting were Vicki Duso, Director of Finance, and Jeff Clark, Director of Human Resources.  At that meeting, I shared with you that I felt you lacked the critical components necessary for me to have confidence and trust that you could continue to function effectively as the Accounting Supervisor for Midland County Educational Service Agency (MCESA).
>
> ***
>
> When recommending to the Board that your employment be terminated, the basis for this will include the following charges:----
> 1.  Unprofessional and/or insubordinate conduct, including:
>     a.  Opposition and defiance related to restructuring and other initiatives within MCESA;
>     b.  Condemnation of, and animosity toward, other MCESA employees;
>     c.  Inflexibility in meeting the needs of the organization and improving customer service;
> 2.  Breach of trust and confidence, related to:
>     a.  Ability to professionally carry out the requirements and expectations of [unintelligible],

      b.  Skills and capacity needed to perform the current and future
         functions of MCESA's Accounting Supervisor;

      c.  Ability to communicate reliably and clearly with your
        supervisor and the superintendent;

      d.  Ability to appropriately perform functions without Interference
        from personal feelings and/or biases;

      e.  Statements about your ability to "cook the books" or bury
        something within the financial records-that no one would ever
        find;

      f.  Poor Judgment and Indiscretion;

    3.  Breach of security, including your failure to follow a directive related
    to the establishment and use of privileged accounts as part of our
    automated financial system.

    4.  Failure to maintain a positive, organized and efficient work
      environment.

In keeping with MCESA's Open Door Policy and Problem / Complaint Resolution Policy and Procedure (copy attached), I feel obligated to remind you of your procedural rights, I believe the appropriate next step should you wish to appeal my recommendation for your termination is to submit your concerns to the Board's Personnel Committee.  Should you wish to initiate an appeal with the Board Personnel Committee, you must do so, in writing, by Monday, October 3, 2005.

*Def. Summary Judgment Exhibit 10 - 9/26/05 Correspondence.*  Though Defendants continue to assert these justifications, Plaintiff's deposition indicates that Defendants implied that her termination was truly a result of the report to Lupton.  *Plaintiff's Deposition* at 107:17.

Plaintiff's employment contract with MCESA was effective July 1, 2005 through June 30, 2006.  It was MCESA's procedure to enter into an employment contract for the term of one year.  At the end of the contract, MCESA's generally renewed contracts for another one year term if they were satisfied with the employee's performance.  This appears to be the circumstances surrounding past contracts between Plaintiff and MCESA over Plaintiff's sixteen year tenure as an MCESA employee.  The contract stated that "this contract may be terminated with the appropriate due process for performance-related issues." *Plaintiff's Summary Judgment Exhibit 131 - Administrator*

*Contract of Employment* at ¶ 8. Additionally, the contract provides that Plaintiff "will be afforded the same benefits granted to other Administrators and is subject to the terms and conditions of policies approved by the Agency's Board of Education." *Id.* at ¶ 5. MCESA's procedures and policies state that upon recommendation of termination by the Superintendent, MCESA's Board of Education ("Board") "shall ensure that the employee's rights have not been violated and that the process is handled in accordance with those laws affecting the employee." *Plaintiff's Summary Judgment Exhibit 110 - MCESA Policies* at § 5160 ¶ 5.

On November 3, 2005, Plaintiff drafted a letter detailing her contention that Volz recommended her termination because she refused to authorize the expenditure. She mailed the letter to Lupton, which Lupton acknowledged receiving from Plaintiff. In this letter Plaintiff wrote "I am requesting that you notify the proper authorities in your area to do an audit of this situation as soon as possible to correct this issue." *Defendants' Summary Judgment Exhibit 15.*

On November 8, 2005, the Board held a special meeting pertaining to the recommendation that Defendants terminate Plaintiff's employment. According to the meeting's minutes, Plaintiff was accompanied by her attorney. Volz outlined his justifications for the recommendation, which were essentially those outlined in the September 26, 2005 correspondence. The Board allowed Plaintiff's counsel to address the board and offer evidence on Plaintiff's behalf. The Board did not allow, however, Plaintiff's counsel to question any of the employees, including the Defendants in this suit. Plaintiff acknowledged that she was present with counsel and her attorney was permitted to question her. At the conclusion of Plaintiff's presentation, the Board decided to "hold-off on a decision" in order to have "the most complete information possible to consider the recommended action."

The Board ordered a third party review of the financial system security hierarchy, the alleged illegal payment, and Lupton's opinion. At the request of the Board, Yeo & Yeo, a certified public accounting firm, conducted the review. The Yeo & Yeo report came to the following conclusions: (1) that there were security lapses in the financial system, (2) that the disputed expenditures made from federal grants were appropriate, and (3) that both Lupton and his supervisor at the state agency agreed with the conclusion that the expenditures were appropriate.

After reviewing the report, the Board addressed Plaintiff's termination at a regularly scheduled board meeting that it held on April 18, 2006. According to the meeting's minutes, Plaintiff and her attorney were present at that meeting and were afforded the opportunity to address the board. Plaintiff read a prepared statement and offered a letter written by a third party familiar with the financial system's security development. The Board asked Plaintiff several questions and reviewed the letter. The Board voted unanimously not to renew Plaintiff's contract and to terminate her further employment.

Plaintiff brought the instant suit in May of 2006. Defendants moved for summary judgment on all counts on July 9, 2007. Defendants' basis for summary judgment of Plaintiff's First Amendment retaliation claim is that there is no triable issue of fact that Plaintiff engaged in constitutionally protected speech.[2] Alternatively, Defendants contend that Volz, Duso, and Clark are entitled to qualified immunity to the § 1983 claim. Next, Defendants contend that Plaintiff can not establish a triable issue of fact under the WPA. Specifically, Plaintiff will be unable to establish that she reported a violation of law or that there was a causal connection between the report and the adverse employment action. In the alternative, Defendants contend that Michigan governmental tort

---

[2] Defendants did not address Plaintiff's § 1983 claim relating to the alleged violation of her substantive and procedural due process rights.

immunity bars Plaintiff's state law claim. See Mich. Comp. Laws § 691.1407 (2005). Finally, Defendants argue that they are entitled to summary judgment of the breach of contract claim because there is no triable issue of fact that there was indeed adequate justification for the termination and that Plaintiff received due process.

Plaintiff's cross-motion for summary judgment contends that there is no triable issue of fact as to Defendants' violation of her substantive and procedural due process rights pursuant to 42 U.S.C. § 1983. Essentially, Plaintiff contends that the Board hearings fell short of the procedural due process required because Plaintiff was not afforded an adequate explanation of the reasons for terminating her, nor an opportunity to examine Volz, Duso, and Clark.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

III.

A.

To establish a violation under § 1983, a plaintiff must show that a defendant acted under color of state law and that the offending conduct deprived her of rights secured by federal law. *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005) (citation omitted). Plaintiff alleged that Defendants infringed upon her First Amendment rights to free speech and right to due process. To establish a *prima facie* first amendment retaliation claim, an employee must show that "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by his protected conduct." *Scarborough v. Morgan County Bd. of Educ.*, 2006 U.S. App. Lexis 28941, *7 (6th Cir. 2006) (citation omitted). A public employer cannot

retaliate against an employee for certain instances of protected speech. *Id.* (citing *Connick v. Meyers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)). "While public employees may not be required to sacrifice their First Amendment speech rights in order to obtain or continue their employment, . . . a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (citations omitted).

First, a court must consider whether an employee's speech "may be fairly characterized as constituting speech on a matter of public concern." *Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002) (citation and internal quotations omitted). The threshold inquiry "requires [the Court] to consider the content, form, and context of a given statement, as revealed by the whole record." *Rodgers*, 344 F.3d at 596. Internal quarrels about personnel and performance do not reach a level of public concern and receive no First Amendment protection. *Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003); *see also Jackson v. Leighton*, 168 F.3d 903, 911 (6th Cir. 1999) (refusing to afford First Amendment protection to the "quintessential employee beef" of management's incompetence) (citation omitted). If the speech intends to "bring to light actual or potential wrongdoing or breach of the public trust," however, then it is the type of speech that the First Amendment is meant to protect. *Rodgers* 344 F.3d at 597.

Recently, the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1960 (2006). In *Garcetti,* a calender deputy for the Los Angeles District Attorney claimed that he was terminated as a result of an internal memorandum that he

drafted regarding possible inaccuracies of a search warrant. *Id.* at 1955. Specifically, the employee sought to uncover potential police misconduct in securing a search warrant. *Id.* at 1955-56. In finding that the employee's speech was outside of First Amendment protection, the Court reasoned that the "controlling factor" was that it was "made pursuant to his [employment] duties." *Garcetti*, 126 S.Ct. 1959-60. The Court recognized that "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." *Garcetti*, 126 S.Ct. at 1961. On the other hand, "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity." *Garcetti*, 126 S.Ct. at 1960. Though the employee's speech had "societal value," it was the employee's employment duty to make such speech and, as a result, it does not garner First Amendment protection. *Id.* at 1960. Furthermore, the Court noted that concern over diminished free speech protection to employees is often addressed by the "powerful network of legislative enactments – such as whistle-blower protection laws and labor codes – available to those who seek to expose wrongdoing." *Garcetti*, 126 S.Ct. at 1962 (citations omitted).

In the instant case, Plaintiff's deposition testimony indicates that she was acting pursuant to her duties as MCESA's accounting supervisor. Her claim of protected speech revolves around conversations with an accountant at an agency that had previously audited MCESA. Plaintiff agreed that her first conversation with Lupton was an "inquiry" into the legitimacy of the expenditure. As a result of the advice, she informed Defendants. After her concerns went unaddressed by Defendants, she initiated another conversation with the Lupton. She acknowledged that she was concerned with her personal liability as an employee and never indicated that she was speaking as

a citizen. When it became clear that Defendants intended to not take any further action, she retained independent counsel to protect herself from allegations of conspiracy to commit fraud. These actions do not indicate that she intended to speak as a citizen seeking to uncover wrongdoing, instead her speech fits squarely within that of the employee speaking pursuant to an employment duty as in *Garcetti*. Also, it is noteworthy that Plaintiff has an alternate remedy available via Michigan's WPA. Thus, Defendants are entitled to summary judgment of Plaintiff's First Amendment claim as her conversations with the auditor were made pursuant to her employment duties and Plaintiff is unable to set forth that Defendants violated her First Amendment right in order to sustain a § 1983 claim.[3]

B.

Next, Defendants challenge Plaintiff's action based on the WPA. Under the WPA, an employer may not discharge an employee because the employee reports a suspected violation of a law or regulation. Mich. Comp. Laws § 15.362 (1981). To establish a *prima facie* claim of retaliation under the WPA, Plaintiff must establish that (1) she engaged in a protected activity, as defined in the WPA, (2) she was discharged, and (3) a causal connection existed between the protected activity and her discharge. *Shallal v. Catholic Social Services of Wayne County*, 566 N.W.2d 571, 574 (1997).

In the instant case, Defendants contend that Plaintiff has not provided evidence that she engaged in protected speech or that there was a causal connection between Plaintiff's "report" and

---

[3] Defendants also moved for summary judgment of the § 1983 claim on the grounds that Defendants are entitled to qualified immunity. In their brief, Defendants only addressed the First Amendment retaliation claim and did not challenge the due process claim. As such, Defendants' qualified immunity argument is moot as summary adjudication is proper for the First Amendment claim on alternate grounds, and Defendants did not address qualified immunity with regard to the due process claim.

-13-

her termination. As discussed above, the WPA requires that the adverse employment activity be in response to a report of wrongdoing. Plaintiff engaged in a series of discussions with an accountant at the Michigan Department of Education who was partly responsible for auditing MCESA's finances. Though Plaintiff acknowledged in her deposition that these discussions were inquiries into the legality of the expenditures, she also testified that she notified her superiors that she had "reported [the] illegal payment" to Lupton, a state auditor. From Defendants' perspective at the time of the communications, it objectively appeared that Plaintiff "reported" alleged wrongdoing. Thus, there is material issue of fact as to whether Plaintiff engaged in protected speech.

Second, Defendants claim that Plaintiff's WPA claim fails because she can not establish a causal connection between the report and the termination. Specifically, Defendants cite the extended time period between Plaintiff's report and her termination, and Volz's extensive written explanation for the decision to terminate Plaintiff's employment. Though Defendants have offered substantial evidence in support of their position that there was not a causal connection, Plaintiff deposition testimony establishes a triable issue of fact. In Plaintiff's deposition, her testimony indicated that she believed that Volz's justification was merely a pretext to remove her from her position, and her testimony alone is sufficient to establish a jury question.

Alternatively, Defendants contend that Volz, Clark, and Duso are immune from the WPA claim under governmental tort immunity under Michigan law. "[E]ach officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer [or] employee . . . while in the course of employment . . . while acting on behalf of a governmental agency" if acting within the scope of the employees authority, the governmental agency is engaged in the exercise of a governmental function, and the employees act

does not amount to gross negligence. Mich. Comp. Laws § 691.1407(2)(a-c) (2005). Additionally, the highest appointed executive official is immune from tort liability if he or she is acting within the scope of his or her executive authority. Mich. Comp. Laws § 691.1407(5) (2005); see also *Nalepa v. Plymouth-Conton Community School Dist.*, 525 N.W.2d 897, 902 (Mich. Ct. App. 1994) (holding a school district superintendent is the highest appointed official for the purposes of the Act).

Defendants assert that the governmental tort immunity provides immunity to the alleged violation of the WPA. The language of the WPA does not abrogate the immunity available to Defendants. Plaintiff has not alleged that Clark or Duso's acts rose to the level of gross negligence, and therefore, they are entitled to immunity pursuant to subsection (2) of § 691.1407. Additionally, Plaintiff has not alleged that Volz, as the highest elected official, acted outside the scope of his authority, and, thus, is also immune pursuant to subsection (5) of § 691.1407. Alternatively, if employment retaliation is more appropriately considered a claim grounded in contract law, then summary judgment is equally appropriate as Volz, Duso, and Clark were not parties to the contract that the was the source of the retaliation.

## C.

Next, Defendants moved for summary judgment of Plaintiff's breach of contract claim. The contract stated that Plaintiff could be terminated for "performance related issues." In as much as the Court has found that there is a triable issue of fact to Plaintiff's WPA claim, there is equally a triable issue with regard to the breach of contract claim. Plaintiff's deposition testimony establishes that the parties dispute whether Defendants terminated her for "performance related issues" or the report to the state agency. Thus, summary judgment should be denied with regard to the employment contract claim against MCESA.

As to the other Defendants, Plaintiffs have not offered any evidence that they were parties to the employment contract. Volz, Duso, and Clark were employed by MCESA and were Plaintiff's superiors. Plaintiffs have not expressed a set of facts that would hold these Defendants accountable for the contract between MCESA and Plaintiff. Thus, it is appropriate to grant summary judgment with respect to the breach of contract claim in favor of Volz, Duso, and Clark.

## D.

Finally, Plaintiff moved for summary judgment of her due process claim on the grounds that the process that Defendants afforded Plaintiff was insufficient. "The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be take is a fundamental due process requirement." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546. "Due process is a flexible concept that generally requires some type of hearing prior to a state's deprivation of an individual's liberty or property." *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991) (citations omitted).

In determining whether a due process violation has occurred, the Court determines whether the plaintiff has a property interest entitled to due process protection [and] if the plaintiff has such a protected property interest, [the] court must determine what process is due."*Mitchell v. Frankhauser,* 375 F.3d 477, 480 (6th Cir. 2004) (citation and internal quotations omitted). Any hearings prior to termination "need not be elaborate." *Id.* Additionally any post-termination hearing "requires that the discharged employee be permitted to attend the hearing, to have the assistance of

counsel, to call witnesses and produce evidence on his own behalf and have an opportunity to challenge evidence against him. *Id.* at 480-81. If a plaintiff has not been afforded due process prior to the deprivation, then "an adequate post-deprivation remedy satisfies [a plaintiff's] right to due process of law." *Walsh v. Cuyahoga County*, 424 F.3d 510, 514 (6th Cir. 2005).

In the instant case, Plaintiff's contention that there is no triable issue of fact that her due process rights were violated is unconvincing. The uncontroverted facts indicate that Defendants afforded Plaintiff with adequate due process in terminating her employment. It is undisputed that the following occurred prior to Plaintiff's termination: Defendants informed Plaintiff that they had recommended her termination; Defendants informed her in writing that she should consult an attorney before executing a waiver; Volz provided written notice of the basis of her recommended termination and specifically informed her of her right to due process; Plaintiff and her attorney attended two hearings before the Board; the Board allowed Plaintiff to make a statement and present evidence on her own behalf at those hearings; the Board held the decision to terminate her in abeyance for six months pending an independent report; and the Board terminated her after she addressed it at the second hearing. These facts indicate that Defendants' procedures undertaken prior to Plaintiffs' termination met and exceeded the requirements of due process. Though Plaintiff contends that the Board's procedures were inadequate because the Board rejected Plaintiff's request to compel Volz, Duso, and Clark to answer Plaintiff's questions, she does not offer any legal authority that indicates the Board was required to do so. As such, Plaintiff has not met her burden to establish that there is no triable issue of fact that Plaintiff was denied due process.

IV.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment [dkt # 38] is **GRANTED IN PART** and **DENIED IN PART**. As to Plaintiff's 42 U.S.C. § 1983 count, Defendants' motion is granted with respect to the First Amendment retaliation claim. As to Plaintiff's Michigan Whistle-blowers' Protection Act count and breach of contract count, Defendants' motion is granted as to Defendants Clark Volz, Vicki Duso, and Jeffrey Clark, and denied as to Defendant Midland County Educational Services Agency.

It is further **ORDERED** that Plaintiff's motion for summary judgment [dkt # 39] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 10, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 10, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS