LAURIE MCCANN,

        Plaintiff,

                                    Case Number 06-13150-BC

v.                                       Honorable Thomas L. Ludington

MIDLAND COUNTY EDUCATIONAL
SERVICES AGENCY,

        Defendant.

_____ /

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, DENYING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT AND REINSTATE THE DUE PROCESS CLAIM, AND DENYING PLAINTIFF'S MOTION FOR SUPPLEMENTAL RELIEF

Plaintiff Laurie McCann ("Plaintiff") filed suit against her former employer, Defendant Midland County Educational Services Agency ("Defendant"), alleging that it violated the Michigan Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.362, breached Plaintiff's employment contract, violated Plaintiff's First Amendment rights, and did not provide adequate due process when it terminated her employment on April 18, 2006. Prior to trial, the Court entered summary judgment in favor of Defendant with respect to Plaintiff's First Amendment and due process claims.

On April 30, 2008, a jury found Defendant liable for the remaining WPA and breach of contract claims. The jury awarded Plaintiff $22,727.00 for economic injury incurred during the period between her discharge and the expiration of her employment contract and $177,273.00 in economic damages incurred during the period between the expiration of her employment contract and her re-employment. The jury also compensated Plaintiff with $200,000.00 for non-economic

damages associated with the WPA violation. The jury awarded nominal damages for Plaintiff's breach of contract claim.

Three post-verdict motions are now before the Court. These motions include the following: (1) Defendant's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, dkt. # 132; (2) Plaintiff's motion to amend her complaint pursuant to Federal Rule of Civil Procedure 15(b) and reinstate her due process claim, dkt. # 130; and (3) Plaintiff's motion for supplemental relief, dkt. # 131.

At the close of Plaintiff's case, Defendant moved for judgment as a matter of law. The Court took the motion under advisement in accordance with Federal Rule of Civil Procedure 50(b). Following the jury's verdict, the Court requested written briefs and established a briefing schedule. Defendant maintains that Plaintiff is not entitled to economic damages beyond the term of her contract of employment with Defendant. Defendant also contends that Plaintiff did not advance sufficient evidence to establish a prima facie case of a WPA violation or a breach of her employment agreement.

Plaintiff's motion to amend seeks to supplement her complaint to include additional allegations concerning the reported violation of law that served as the basis for her WPA claim. Plaintiff's motion for supplemental relief requests to have Defendant fully reinstate her pension rights, pursuant to Mich. Comp. Laws § 15.364, and remove documents from her personnel file that indicate unsatisfactory performance, pursuant to Mich. Comp. Laws § 423.505.

On June 9, 2008, the Court entertained oral arguments on these motions. While the immediate opinion is written post-trial, it is without the benefit of a transcript. The facts, for the reader's information, derive from the discovery information and from the Court's notes from trial

testimony. For the reasons stated below, the Court will grant in part and deny in part Defendant's motion for judgment as a matter of law, deny Plaintiff's motion to amend her complaint and reinstate the due process claim, and deny Plaintiff's motion for supplemental relief.

I

Plaintiff served as Defendant's accounting supervisor from January 4, 1989 until her suspension on September 16, 2005. On that day, Defendant's superintendent, Clark Volz ("Superintendent"), recommended that Defendant terminate Plaintiff's employment contract for unprofessional and insubordinate conduct, breach of trust, failing to develop or maintain security of the automated financial system, and failure to maintain a satisfactory work environment. Plaintiff contends that Defendant terminated her employment in retaliation for reporting "spending irregularities" that violated the terms of grants from the federal government. After entertaining management's recommendation to end Plaintiff's employment and then conducting two hearings and an independent accounting review, Defendant's Board of Education ("Board") decided to terminate Plaintiff's employment as of April 18, 2006 and to not renew her employment contract upon the expiration of her current agreement, June 30, 2006. On July 11, 2006, Plaintiff filed the instant suit.

The parties' dispute began in February of 2005 when Plaintiff became concerned that an employee benefit expenditure by Defendant might violate an applicable collective bargaining agreement. The provisions of the collective bargaining agreement provided an employee and his or her spouse health coverage, if the spouse did not have an independent source of coverage.

According to Plaintiff, Defendant's employee and her spouse, Jane Doe and John Doe

respectively, were recipients of the aforementioned health coverage plan at the end of 2004.[1] At that time, John Doe was not employed by Defendant and received benefits solely as Jane Doe's spouse. In January of 2005, Defendant hired John Doe as a substitute teacher, a semi-permanent position. Plaintiff contends that, despite the fact that John Doe was eligible for health insurance in his own right, he elected not to enroll in the benefits plan, but he continued to receive spousal health coverage under Jane Doe's health benefit. In lieu of individual health coverage provided by his individual employment contract, John Doe received a cash benefit.[2] As the accounting supervisor, Plaintiff became concerned not only about whether John Doe was entitled to the cash benefit under the collective bargaining agreement, but that the cash benefit might also violate federal grant guidelines that provided federal funds could not be used for employee benefits that were not provided pursuant to the union contract. Upon discovering what Plaintiff believed to be the irregularity in February of 2005, she telephoned a Michigan Department of Education auditor, Norm Lupton ("State Auditor"). Plaintiff initially contacted the State Auditor to determine how to correct the problem. Plaintiff characterized the initial call to the State Auditor as an inquiry. Plaintiff testified that she did inform Vicki Duso, her immediate supervisor and Defendant's director of instruction and finance ("Director of Finance"), that she had inquired about the propriety of the cash benefit.

According to Plaintiff, the State Auditor advised her that the cash benefit constituted a violation of federal grant guidelines. The State Auditor suggested that the cash benefit needed to be individually approved by the Board and paid with monies other than federal funds. Plaintiff also

---

[1] The parties agreed to not identify Jane and John Doe to respect their privacy. The parties have alternatively referred to Jane and John Doe as Mrs. and Mr. R in their pleadings.

[2] The parties have also referred to the cash benefit as the "Cash Option Issue" in the pleadings.

testified that management did not take any corrective action.

In March of 2005, Plaintiff testified that she again called the State Auditor to discuss her professional responsibilities as an accountant and the consequences of approving a financial report that included the cash benefit. After the conversation, Plaintiff informed the Director of Finance that she called the State Auditor to "report" the illegal payment and Defendant's inaction in correcting the payment. At that point, Plaintiff said she retained counsel for independent consultation regarding her personal liability for the potentially fraudulent conduct of approving the cash benefit. She testified that she also informed Defendant's director of human resources, Jeffrey Clark ("HR Director"), about her report to the State Auditor. As the Court recalls the testimony, the HR Director did not recall the inquiry or, if he did, he understood the gravity of the question to be limited to be whether the union contract provided for the benefit or not. Plaintiff testified, however, that Defendant again did not respond to her inquiries, and its administration blocked any further attempts to discuss the cash benefit.

In August of 2005, Defendant was preparing its financial reports for the 2004 to 2005 fiscal year. As part of her employment duties, Plaintiff needed to approve the report and "sign-off" on it. At that point, Plaintiff testified that Defendant had not fully addressed Plaintiff's concern over the cash benefit. Plaintiff testified that, as a result, she refused to sign the report.

During the same period of time, Defendant was restructuring it organization that altered the employment duties of Plaintiff and the Director of Finance. In August and September of 2005, Plaintiff participated in at least three meetings with the Superintendent and the Director of Finance to discuss the reorganization. In late August of 2005, Plaintiff met with the Director of Finance to discuss candidates for a new position. One of those candidates was Defendant's receptionist, Ms.

Y ("Receptionist"), who Plaintiff knew personally and professionally. Plaintiff did not believe the Receptionist to be qualified for the position. Moreover, Plaintiff personally knew the Receptionist's husband, as he had previously performed some construction work in Plaintiff's home. According to Plaintiff, the Receptionist's husband touched her in an inappropriate manner while working in her home. Plaintiff informed the Director of Finance of the incident when discussing the Receptionist's possible promotion.

Plaintiff's sister, Lesia O'Keefe ("Plaintiff's Sister"), also worked for Defendant. Apparently, Plaintiff's Sister had concerns regarding how reorganization would affect her position. Plaintiff arranged a meeting with the Superintendent and Plaintiff's Sister to discuss Plaintiff's Sister's concerns. On September 1, 2005, the Superintendent met with Plaintiff and Plaintiff's Sister. During that meeting, Plaintiff was on pain medication and was unable to recall specifically what she said at the meeting. According to the Superintendent, Plaintiff expressed concerns about the restructuring in front of Plaintiff's Sister. Plaintiff also expressed concerns relating to the Receptionist's placement. The Superintendent considered expressing that view in front of a subordinate employee to be in bad judgment and believed doing so compromised her position as a supervisor. The Superintendent characterized Plaintiff's conduct as emotional and aggressive.

On September 6, 2005, Plaintiff made inappropriate comments, in the Superintendent's view, regarding the Receptionist at a meeting with the Superintendent and the Director of Finance to further address restructuring. Plaintiff denied making statements critiquing the Receptionist at that meeting. On September 13, 2005, Plaintiff again met with the Superintendent and the Director of Finance to discuss the restructuring plan. Plaintiff contended that any discussion about the new position was in general terms and not specific to the Receptionist. The Superintendent recalled

meeting with the Director of Finance and Plaintiff to discuss Plaintiff's comments made in front of Plaintiff's Sister. From the perspective of the Superintendent, Plaintiff demonstrated both aggression and animosity towards the Receptionist. The Superintendent recalled that Plaintiff stated that the Receptionist was "stupid" and would be unable to perform her duties after implementing the restructuring plan. The next day, the Director of Finance expressed her displeasure to Plaintiff regarding her comments about the Receptionist.

On September 16, 2005, Plaintiff met with the Superintendent, the Director of Finance, and the HR Director. According to the Superintendent, he informed her that he no longer trusted Plaintiff to effectively perform her duties and that she had conducted herself in an unprofessional manner. As a result, the Superintendent decided that he would recommend the termination of Plaintiff's employment. The Superintendent offered Plaintiff a settlement, in which it would pay Plaintiff $14,000 in exchange for her waiver of any future right to make claims against Defendant. The waiver provided:

> In signing this Release, [Plaintiff] acknowledges that:
> 1. She has been advised to consult with an attorney before signing this Release.
> 2. She has been given at least twenty-one (21) days to consider the Release, although she may voluntarily execute the Release in less than 21 days.

Dkt. # 38-10. Plaintiff did not sign the release. Plaintiff disputed that the Superintendent expressed his justification for recommending her discharge at that meeting. Indeed, she believed he indicated that if she did not sign the agreement, then he would not recommend her to future employers.

On September 26, 2005, the Superintendent officially placed Plaintiff on administrative leave and provided her with written justification detailing Defendant's basis for Plaintiff's termination. The letter stated in pertinent part that:

> I requested a meeting with you on September 16, 2005 to discuss some concerns I

had about you in your role as Accounting Supervisor. Also present at that meeting were Vicki Duso, Director of Finance, and Jeff Clark, Director of Human Resources. At that meeting, I shared with you that I felt you lacked the critical components necessary for me to have confidence and trust that you could continue to function effectively as the Accounting Supervisor for [Defendant]

* * *

When recommending to the Board that your employment be terminated, the basis for this will include the following charges:----
1. Unprofessional and/or insubordinate conduct, including:
    a. Opposition and defiance related to restructuring and other initiatives within [Defendant];
    b. Condemnation of, and animosity toward, other [of Defendant] employees;
    c. Inflexibility in meeting the needs of the organization and improving customer service;
2. Breach of trust and confidence, related to:
    a. Ability to professionally carry out the requirements and expectations of [unintelligible],
    b. Skills and capacity needed to perform the current and future functions of [Defendant]'s Accounting Supervisor;
    c. Ability to communicate reliably and clearly with your supervisor and the superintendent;
    d. Ability to appropriately perform functions without Interference from personal feelings and/or biases;
    e. Statements about your ability to "cook the books" or bury something within the financial records-that no one would ever find;
    f. Poor Judgment and Indiscretion;
3. Breach of security, including your failure to follow a directive related to the establishment and use of privileged accounts as part of our automated financial system.
4. Failure to maintain a positive, organized and efficient work environment.

In keeping with [Defendant]'s Open Door Policy and Problem / Complaint Resolution Policy and Procedure (copy attached), I feel obligated to remind you of your procedural rights, I believe the appropriate next step should you wish to appeal my recommendation for your termination is to submit your concerns to the Board's Personnel Committee. Should you wish to initiate an appeal with the Board Personnel Committee, you must do so, in writing, by Monday, October 3, 2005.

Dkt. # 93-12.

On November 3, 2005, Plaintiff drafted a letter detailing her contention that the Superintendent recommended her termination because she refused to authorize the cash benefit ("November 3 Letter"). Dkt. # 107-19. She mailed the November 3 Letter to the State Auditor, which he acknowledged receiving. Plaintiff wrote, "I am requesting that you notify the proper authorities in your area to do an audit of this situation as soon as possible to correct this issue." *Id.* The letter raises the cash benefit and the purchase of certain office supplies with federal grant monies at Defendant's Hillside School ("Hillside Expenditures").

On November 8, 2005, the Board held a special meeting to address the recommendation that Defendant terminate Plaintiff's employment. Dkt. # 93-13. According to the meeting's minutes, Plaintiff was present and accompanied by her attorney. *Id.* at 1. The Superintendent outlined his justifications for the recommendation to the Board, which were essentially those indicated in the September 26, 2005 correspondence. *Id.* Plaintiff's counsel addressed the Board, responded to the Superintendent's remarks, and offered information on Plaintiff's behalf. *Id.* at 2. The Board did not permit, however, Plaintiff's counsel to question employees, including the Superintendent and the Director of Finance. *Id.* At the conclusion of Plaintiff's presentation, the Board decided to "hold-off on a decision" in order to compile "the most complete information possible to consider the recommended action." *Id.*

The Board elected to appoint a third party to review the financial system security hierarchy, the cash benefit, and the State Auditor's opinion concerning the propriety of the cash benefit. At the request of the Board, Yeo & Yeo, a certified public accounting firm, was retained to conduct a review of the circumstances. After considering Plaintiff's input, her counsel's remarks, and the Superintendent's presentation, the Board requested Yeo & Yeo independently perform the

following:

> 1. A thorough third party review of the financial security hierarchy and associated clearances with a full risk characterization of the observations to the financial operations of the district.
> 2. A thorough third party review of the points referenced that led to the alleged non-signing off of documents during the financial audit.
> 3. A third party review of information shared with [the State Auditor] and a third party opinion on alleged State Auditor advice.

Dkt. # 93-15. Ultimately, the Yeo & Yeo report concluded as follows: (1) that the financial system was susceptible to possible risks "due to the 'overrides' of the system's security," (2) that any documents related to the audit report were signed by [Defendant]'s employee, and (3) that both the State Auditor and the state's special education finance management supervisor agreed with the conclusion that the expenditures were appropriate. *Id.* With respect to the third query, Yeo & Yeo provided the following episode to the State Auditor:

> [Jane Doe] was entitled to and received contractual health insurance benefits for herself and her spouse (two-person coverage). In January of 2005, the spouse was hired by the [Defendant], but not eligible for contractual benefits until April 2005,which included either health insurance or a "cash in lieu of benefit" option in accordance with the MFT Union Contract and Board Policy.
>
> The spouse, already covered by the health insurance benefit through his wife, opted to take the "cash in lieu of benefit" in April 2005. This resulted in [Jane Doe] being enrolled in two-person health insurance, and her spouse opting for the "cash in lieu of benefit." Both employees are funded by the Special Education budget.
>
> Based on these facts, can Federal funds, as approved in the Federal grant application, be allocated to pay for these benefits in the same proportion as salaries are paid from federal funds?
>
> Can local or state funds be allocated to pay for these benefits?

*Id.* at 4-5. Plaintiff contended at trial that the inquiry, as posed, inaccurately reflected Plaintiff's concern regarding the cash benefit. The Yeo & Yeo report indicated that the State Auditor and the special education finance management advisor concluded that the payments were not in violation

of accounting procedures and provided the following response: "[i]f the benefits are a part of the district's approved fringe benefit package and the employee is an approved special education budgeted expense to either IDEA grant or an approved 4096 expense, then the district may fund the fringe benefit to the budgeted cost center." *Id.* at 5.

After receiving the report, the Board addressed the recommendation to terminate Plaintiff's employment at a regularly scheduled board meeting held on April 18, 2006. According to the meeting's minutes, Plaintiff and her attorney were again present at that meeting and were permitted an opportunity to respond. She elected to read a prepared statement and offered a letter written by a third party familiar with the financial system's security development. The Board asked Plaintiff several questions and reviewed the letter. The Board voted not to renew Plaintiff's contract and to terminate her existing contract of employment.

Plaintiff's employment contract with Defendant was effective July 1, 2005 through June 30, 2006 and paid her an annual salary of $60,273.00. The contract conformed with Defendant's procedure to enter into annual employment contracts. The contract provides that it "may be terminated with the appropriate due process for performance-related issues." Dkt. # 93-4 at ¶ 8. Additionally, the contract provides that Plaintiff "will be afforded the same benefits granted to other Administrators and is subject to the terms and conditions of policies approved by the Agency's Board of Education." *Id.* at ¶ 5. Defendant's procedures and policies state that upon recommendation of termination by the superintendent, Defendant's Board "shall ensure that the employee's rights have not been violated and that the process is handled in accordance with those laws affecting the employee." Dkt. # 100-3 at 7.

Plaintiff maintained that Defendant automatically renewed annual contracts for employees

that "performed satisfactorily." The Director of Finance stated, however, that the Board's practice was to conduct an administrative review of employee performance followed by an administrative recommendation on contracts for the ensuing school year. Upon such review, the Board takes formal action, at their discretion.

On July 11, 2006, Plaintiff filed her original complaint alleging a violation of 42 U.S.C. § 1983, violation of the WPA, and breach of contract. Dkt. # 1. Plaintiff's 42 U.S.C. § 1983 claim asserted theories under the First Amendment and the due process clause of the Fourteenth Amendment, though under a single count alleging violation of 42 U.S.C. § 1983. *See id.*

In July of 2007, the parties filed cross-motions for summary judgment. *See* dkt. # 38-39. Plaintiff's motion for summary judgment only sought partial relief with respect to the alleged due process violation pled under the 42 U.S.C. § 1983 claim. Defendant[3] sought summary judgment with respect to each of Plaintiff's claims. Defendant addressed only the First Amendment theory advanced by Plaintiff and not her due process theory. The Court denied Plaintiff's motion for summary judgment and granted in part and denied in part Defendant's motion for summary judgment. Dkt. # 62. The Court concluded that Plaintiff could not establish a prima facie First Amendment claim against Defendant because her "protected speech" was made pursuant to her official employment duties. *See id.* at 11-13 (*citing Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006)). The Court concluded that a factual dispute existed with respect to the WPA and breach of contract claims.

The parties each brought a motion for reconsideration of the Court's opinion. Defendant

---

[3] Plaintiff also named the Superintendent, the Director of Finance, and the HR Director as defendants in this matter. Each was summarily dismissed as a consequence of the Court's disposition of Defendant's summary judgment motions.

asserted that Plaintiff's complaint inadequately pled distinct theories, such that it did not have notice of the due process claim under 42 U.S.C. § 1983. Plaintiff contended that the Court erred in denying Plaintiff's motion for summary judgment. In disposing of those motions, the Court concluded that Plaintiff's complaint did not clearly allege distinct 42 U.S.C. § 1983 causes of action. Consequently, the Court granted Plaintiff leave to file an amended complaint so that she might clearly inform Defendant of her due process claim. The Court also permitted the parties to renew their motions for summary judgment with respect to that claim. Plaintiff and Defendant renewed their motions for summary judgment with respect to the due process claim on December 20, 2007 and January 31, 2008, respectively. The Court granted Defendant's motion and denied Plaintiff's motion. The Court concluded that the process employed by Defendant prior to terminating Plaintiff's employment met the minimum standards set forth in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1986), and its progeny.

On April 22, 2008, the matter proceeded to trial. At the conclusion of Plaintiff's proofs, Defendant orally moved for judgment as a matter of law. The Court permitted the parties to develop an oral record outside the presence of the jury, permitted the parties to file written briefs in support and opposition, and took the motion under advisement, as provided for in Federal Rule of Civil Procedure 50(b).

The jury returned a verdict in favor of Plaintiff with respect to the WPA and breach of contract claims. The jury awarded the following economic damages for the WPA claim: (1) $22,727.00 for the period between the date of her discharge and the expiration of her contract, i.e. from April 18, 2006 to June 30, 2006, and (2) $177,273.00 for the period between the date of the expiration of her contract and the date her re-employment, i.e. from July 1, 2006 to February 11,

2008.  The jury also awarded the nominal amount of $1.00 for the above described periods for the

breach of contract claim.  Plaintiff acknowledged that she became re-employed on February 12,

2008.  The jury awarded $200,000.00 in non-economic damages for the WPA violation and nominal

damages for the breach of contract.  Important to a review of the verdict is the fact that the Court

did instruct the jury that it could assess damages once, not withstanding the fact that they may

believe that Plaintiff met her burden of proof on each cause of action.  Dkt. # 128 at 11.  The parties

filed the instant motions on May 7, 2008.  The Court heard oral argument on June 9, 2008.

II

The standard of review for a motion for judgment as a matter of law under Federal Rule of

Civil Procedure 50(a) is governed by the same standard for motions for summary judgment.

*Anderson v.  Liberty Lobby*, 477 U.S. 242, 250 (1986).  This Court must "direct a verdict if, under

the governing law, there can be but one reasonable conclusion as to the verdict" or if there is

insufficient evidence to create a genuine issue of fact for resolution by a jury.  *Id.*  Stated otherwise,

if after viewing the evidence in the light most favorable to the non-moving party, "a reasonable trier

of fact could draw only one conclusion," judgment should be granted for the moving party.

*American & Foreign Ins. Co.  v.  Bolt*, 106 F.3d 155, 157 (6th Cir. 1997); *see also Jordan v. City

of Cleveland*, 464 F.3d 584, 594 (6th Cir. 2006).

III

A

As stated above, the Court entertained a brief summary of the merits of Defendant's motion

for judgment as a matter of law at sidebar during trial.  The Court preliminarily expressed its belief

that inadequate evidence had been offered to submit Defendant's "extra contractual" responsibility to the jury for consideration. The Court decided to permit the jury an opportunity to consider Defendant's liability beyond the end date of the employment contract and provided a special verdict form for that purpose. *See* dkt. # 124. The verdict form permitted the jury to award economic damages sustained during the term of the contract and to award damages for the term post-dating the contract, if they found so. In the event the question of the Defendant's responsibility for post-contract economic damages was properly submitted to the jury, its conclusions would be preserved.

Defendant's motion for judgment as a matter of law raised two challenges to the jury's verdict. First, it asserts the jury unreasonably concluded that the employment contract entitled Plaintiff to economic damages beyond the terms of her contract. Second, Defendant advances the argument that the evidence presented did not establish a prima facie claim of a violation of the WPA or of breach of contract. The parties argued the merits of the motion at a June 9, 2008 hearing. Defendant maintains that Plaintiff did not present evidence of the parties' conduct that would render the terms of the contract ineffective, such that Plaintiff had a right to renewal after the expiration of the contract on June 30, 2006.

Plaintiff contends that Defendant's custom and practice to annually renew the contract demonstrates that the parties intended to continue Plaintiff's employment beyond the definite term of the contract. Plaintiff offers the following in support of this argument: (1) the contract did not specify that her employment ended on a specific date, only a expiration date of the contract; (2) the contract referenced "subsequent" contracts between the parties, dkt. # 107-4 at ¶ 8; (3) the testimony of the Superintendent demonstrated that the Board's practice was to approve individual employment contracts as a part of the annual budget recommended by management, without separate attention;

(4) the testimony of the Director of Finance acknowledged that Defendant renewed contracts if an employee performed satisfactorily; and (5) Plaintiff's employment evaluations indicate that Plaintiff was on a "continuing" contract.[4] Dkt. # 135 at 2-3.

In support of their respective positions, Plaintiff and Defendant each rely on legal authority that appears to be inapposite. Plaintiff relies on the broad legal principle that a contract "must be interpreted according to the intent of the parties." Dkt. # 135 at 2 (*citing Sobczak v. Kotwicki*, 79 N.W.2d 471, 475 (Mich. 1956) (citations omitted). The Court does not dispute this general principle of contract law, however, citation to this principle provides little guidance as to the instant facts. Defendant, on the other hand, relies on *Edinger v. Bd. of Regents of Moorehead State Univ.*, 906 F.2d 1136, 1139-41 (6th Cir. 1990), which rejected the plaintiff's argument of "de facto tenure" and concluded that the plaintiff did not have a protectable property interest entitling him to due process protection. The court in *Edinger* considered whether an employee has a legitimate expectation of continued employment in conjunction with the plaintiff's due process claim. Neither party offers authority particularly relevant to whether Plaintiff may state a cause of action for economic damages beyond the expiration of an employment agreement under Michigan law and, if so, under what circumstances.

As a general proposition, courts are to enforce an unambiguous contract provision as written. *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 31 (Mich. 2005). In the context of an employment contract, a prior oral agreement will not alter the terms of a later written contract because the employee assented to the terms of the written agreement. *Novak v. Nationwide Mutual Ins. Co.*, 599

---

[4] Plaintiff's brief references certain exhibits and excerpts from testimony. Plaintiff did not provide adequate citations such that the Court could reasonably ascertain which documents she references. Moreover, Plaintiff nor Defendant have provided a trial transcript.

N.W.2d 546, 550 (Mich. Ct. App. 1999) (finding that the employer's oral statements did not modify an "at-will" employment contract into an implied "just-cause" employment contract).

An employer is also generally not liable for breach of contract for the non-renewal of an employment contract with a definite term. *Reisman v. Regents of Wayne State University*, 470 N.W.2d 678, 682 (Mich. Ct. App. 1991). In *Reisman*, the plaintiff's employment contract had twice been renewed for an additional term of one year. *Id.* at 681. The defendant chose not to renew the plaintiff's contract, and the plaintiff brought a claim for breach of contract. *Id.* The Michigan Court of Appeals upheld the judgment of no cause because the plaintiff agreed to the express one-year term contained in the defendant's "'statutes' and [the parties'] letters of offer and acceptance." *Id.* The defendant's letters, however, did provide the following disclaimer, "Please note that this appointment carries no presumption of reappointment beyond the stated time period." *Id.*; *see also Mullen v. Parchment School Dist. Bd. of Educ.*, 2007 WL 1932031, *4 (Mich. Ct. App. 2007) (unreported) (holding that failure to renew a contract that "provided a specified definite period of time, duties to be performed, and compensation to be paid" can not support a breach of contract claim; reasoning that interpreting an employment contract as such, absent an employer's clearly and unequivocally expressed intent, would create a "lifetime" employment contract). Michigan law requires that the employer clearly express its intent to extend the terms of an employment contract. Otherwise, a cause for breach of contract is limited to the time period specified in the contract itself.

In this instance, Plaintiff did not proffer any evidence demonstrating that Defendant expressed an intent to create a contract beyond its definite term or any conduct that might support her reasonable reliance to the contrary. The employment contract established a definite term of July 1, 2005 through June 30, 2006. Indeed, Paragraph (8) of the contract contemplates "subsequent"

contracts between the parties, but it does not furnish a basis for believing that forthcoming contracts are being promised. Nor did the testimony of the Superintendent or the Director of Finance establish that Defendant expressed an intent to automatically renew the contract. Rather, the facts bear out that the parties entered into contracts for the specific term of one year. Plaintiff expressed an expectation of renewal solely based on her own observation that her contract had in fact been previously renewed. Ultimately, Plaintiff did not offer any evidence of Defendant's conduct that would provide a reasonable basis for her, or the jury, to conclude that her contract would be renewed beyond its term. Thus, the Court will grant Defendant's motion in part and vacate the jury's award of economic damages after the June 30, 2006 contract termination date.

Next, Defendant believes that it is entitled to judgment as a matter of law with respect to the WPA claim because, prior to trial, Plaintiff did not clearly assert that her internal communications to superiors were a report, within the meaning of the WPA, and that Plaintiff did not demonstrate a causal connection between her discharge and the protected activity.

Under the WPA, an employer may not discharge an employee because the employee reports a suspected violation of a law or regulation. Mich. Comp. Laws § 15.362. To establish a prima facie claim of retaliation under the WPA, Plaintiff must establish that (1) she engaged in a protected activity, as defined in the WPA, (2) she was discharged, and (3) a causal connection existed between the protected activity and her discharge. *Shallal v. Catholic Social Services of Wayne County*, 566 N.W.2d 571, 574 (Mich. 1997). Moreover, "[t]he WPA does not require that an employee of a public body report . . . suspected violations to an outside agency or higher authority to receive the protections of the WPA." *Brown v. Mayor of Detroit*, 734 N.W.2d 514, 518 (Mich. 2007). In *Brown*, a plaintiff provided a report to the department's professional accountability bureau

concerning suspected illegal conduct by the defendant. *Id.* at 516. A second plaintiff circulated a memorandum discussing the allegations to the chief of police. *Id.* Each plaintiff was either transferred or discharged from their respective positions. *Id.* Though each report was communicated internally, the Supreme Court of Michigan concluded that the applicability of the WPA does not require a report to an external public body. The court reasoned that the statutory language unambiguously applied to a report to any public body – internal or external. *Id.* at 518.

Defendant believes that the evidence Plaintiff presented did not support the conclusion that Plaintiff reported a suspected violation of a regulation to a public agency. Defendant interprets the evidence adduced at trial as follows: (1) Plaintiff testified that a co-worker, Amee Hughes, initially raised the potential problem concerning the cash benefit; and (2) Plaintiff's Sister testified that neither Plaintiff nor she knew whether the cash benefit was a violation of the collective bargaining agreement. Therefore, in Defendant's view, any internal discussion was actually an inquiry, and not a report of a suspected violation of law, rule, or regulation. Additionally, Defendant maintains Plaintiff did not offer any evidence that the cash benefit, in fact, was a violation.

As the Court identified in its earlier opinion, Plaintiff testified that she informed the Superintendent and the Director of Finance that she had contacted a state auditor regarding the cash benefit prior to her suspension and eventual discharge and the State Auditor's opinion that the expenditure was not authorized by law. *See* dkt. # 62 at 14. Consequently, Plaintiff's testimony furnished a factual basis for the jury to conclude that Plaintiff reported her belief of a violation of the grant guidelines to Defendant and that a causal connection existed between the report and her discharge, Defendant's interpretation of the testimony notwithstanding.

Defendant also maintains that Plaintiff asserted a new theory at trial with respect to the

suspected violation, namely the Hillside Expenditures. Defendant emphasizes inconsistencies between Plaintiff's trial testimony and her deposition. Specifically, Plaintiff stated that she raised only the cash benefit with the Director of Finance, not the Hillside Expenditures. Further, Defendant objects to Plaintiff's reliance on her November 3 Letter – referring the Hillside Expenditures as well as the cash benefit – to demonstrate that she reported a violation of law. Defendant emphasizes that the letter post-dated both her suspension and recommended termination of employment. Consequently, Defendant believes Plaintiff solely relied on the November 3 Letter as the report of a suspected violation of law.

As discussed above, Plaintiff offered evidence demonstrating a causal connection between her report of the cash benefit and her termination. While testimony concerning the Hillside Expenditures and the November 3 Letter were introduced into evidence, it was not, so far as the Court was concerned, to introduce the factual basis for an independent cause of action. On the contrary, the statements were admitted because of the fact that in at least two instances the Hillside Expenditures were referred to in the context of conversations that also addressed the cash benefit.

Lastly, Defendant believes that it is entitled to judgment as a matter of law with respect to the breach of contract claim. Despite the verdict, Defendant still maintains that it terminated Plaintiff "for performance-related issues." Defendant's position notwithstanding, Plaintiff offered sufficient evidence from which the jury could conclude that Defendant terminated Plaintiff for reporting a suspected violation of the federal grant guidelines. Thus, the Court will deny Defendant's motion with respect to the jury's conclusions of liability for the WPA violation and breach of contract.

B

Turning to Plaintiff's motion to amend the complaint and reinstate her due process claim, Plaintiff seeks leave of the Court to amend her complaint to conform to the proofs at trial. The Federal Rules of Civil Procedure allow for the post-verdict amendment of pleadings as follows:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2). The Rules employ "a liberal policy of permitting amendments in order to ensure determination of claims on their merits." *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 693 (6th Cir. 2001) (citations omitted). "When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *CGH Transport, Inc. v. Quebecor World, Inc.*, 261 Fed. Appx. 817, 824 (6th Cir. 2008). "It is entirely appropriate to allow a party to amend its theories to conform to the evidence, particularly where the evidence is under the control of another party." *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991). If a party has implicitly consented to the introduction of the evidence, then amendment to conform to the evidence is appropriate. *See Sasse v. United States Dept. of Labor*, 409 F.3d 773, 781 (6th Cir. 2005); *see also* 3 Moore's Federal Practice 3d § 15.18 (Matthew Bender 3d. ed.). "To establish implied consent in the context of Rule 15(b) it must appear that the parties understood the evidence to be aimed at the unpleaded issue." *Sasse*, 409 F.3d at 781 (citation and quotation omitted).

Here, amendment is not justified. Plaintiff seeks to amend the complaint to bolster the factual basis for her claim. Namely, to include additional allegations of internal reports of wrongdoing, that is the Hillside Expenditures. Defendant did object at trial to the inclusion of

evidence in support of these allegations. As previously indicated, in the Court's view, the statements were properly admitted because they were contextually intertwined with discussions that directly addressed the cause of action that Plaintiff expressly plead. The allegations that Plaintiff seeks to include in an amended complaint were known to both parties well in advance of trial. A post-trial amendment is intended to formally address a cause of action that was informally assented to during trial. Defendant did not formally assent to the introduction of the Hillside evidence as a new or additional cause of action. Thus, the Court will deny Plaintiff's motion to amend.

Plaintiff also requests that the Court reinstate the due process claim and enter judgment in her favor. This request merits little attention. Plaintiff believes that the jury's verdict determined that Plaintiff had a legitimate expectation of continued employment beyond the expiration of her contract, June 30, 2006. Plaintiff's request ignores the fact that the focus of the question addressed on the parties' cross-motions for summary judgment was the adequacy of the process employed, and not its later conformity with the jury's verdict. Dkt. # 118 at 2. The jury's verdict reasonably supports the view that the Board's conclusion–that Plaintiff was properly being discharged for performance related issues–was different than the jury's conclusion. It does not, however, demonstrate that the process Defendant employed in reaching that conclusion was necessarily flawed, which is at the core of a due process claim. Thus, the Court will deny the request.

C

Finally, Plaintiff seeks supplemental relief under the WPA and the Bullard-Plawecki Right to Know Act ("BPA"), Mich. Comp. Laws 423.501 *et seq.* The WPA provides that "[a] court, in rendering a judgment in an action brought pursuant to this act, shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe

benefits and seniority rights, actual damages, or any combination of these remedies." Mich. Comp. Laws § 15.364.

Plaintiff requests that Defendant "reinstate Plaintiff's employment through February 11, 2008 and [] pay all appropriate parties the necessary contributions to the pension plan so that Plaintiff is viewed by the pension administrator as a person whose credited service was not interrupted . . . " Dkt. # 131 at 4. Plaintiff concedes in her motion that the jury award should be offset by any contribution to the pension plan. Defendant contends that the jury considered Plaintiff's loss of pension time credit and awarded damages to compensate Plaintiff. At trial, Plaintiff's counsel argued that she would be required to work an additional twenty-two months to make up for the diminished pension benefits.

The WPA, pursuant to Mich. Comp. Laws § 15.364, authorizes the Court to reinstate a pension benefit plan. Plaintiff, however, elected to present testimony to the jury that she should be monetarily compensated for her loss for the value of her pension. The jury had the opportunity to consider Plaintiff's lost vesting rights when determining her damages. Thus, Defendant correctly explains that the jury has considered the relief Plaintiff elected to request.

Next, Plaintiff seeks removal of documents from her personnel file under the BPA. Mich. Comp. Laws §§ 423.501 *et seq*. The BPA provides for an employee to view his or her personnel record, and challenge the information contained within. Mich. Comp. Laws §§ 423.503, 423.505. Additionally, it provides for a process to resolve disputes, including the last resort of filing suit for the expungement of challenged documents. Mich. Comp. Laws § 423.505. Prior to filing suit, the employee must attempt to consensually resolve the matter and inform the employer, in writing, which documents the employee disputes. *Id.* The BPA authorizes an employee to commence an

action to compel compliance with the act. Mich. Comp. Laws § 423.511.

Plaintiff asserts that the jury verdict establishes that Plaintiff's employment performance was satisfactory. Thus, any documents post-dating April 27, 2005 indicating otherwise should be removed from her personnel file. Defendant responds that the relief is not warranted as they still maintain that Plaintiff's performance was not satisfactory.

Plaintiff's complaint did not seek relief under the BPA. The BPA authorizes Plaintiff to initiate a legal action under the BPA, but she did not do so here. Mich. Comp. Laws § 423.505; *see, e.g. Ozier v. RTM Enterprises of Georgia, Inc.*, 229 Fed.Appx. 371, 377-78 (6th Cir. 2007) (considering the plaintiff's BPA claim, which was alleged as an individual claim in the complaint). Additionally, Plaintiff requests relief under section 423.511, which contemplates "willful violations" of the act. Section 423.511 implies that a violation is the failure to allow an employee access to the personnel file, not a good faith dispute concerning its contents. *See id.* (considering a willful violation in the context of the employer not turning over the personnel file to the employee). Ultimately, Plaintiff has not met the procedural requirements that entitle her to relief under the BPA. Namely, Plaintiff did not allege a cause of action under the BPA entitling her to such relief. Moreover, Defendant retains its own independent view of the facts which is not altered by the jury's verdict. Therefore, the Court will deny the motion.

IV

Accordingly, it is **ORDERED** that Defendant's motion for judgment as a matter of law [Dkt. # 132] is **GRANTED** in part and **DENIED** in part. The jury's award of $177,273.00 in economic damages for the period of July 1, 2006 to February 11, 2008 for the violation of the Whistleblowers' Protection Act and the award of $1.00 in economic damages for the period of July 1, 2006 to

February 11, 2008 for the breach of contract are **VACATED**.  The remainder of the jury's verdict shall remain intact.

It is further **ORDERED** that Plaintiff's motion to amend her complaint and to reinstate the due process claim [Dkt. # 130] is **DENIED**.

It is further **ORDERED** that Plaintiff's motion for supplemental relief [Dkt. # 131] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 23, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 23, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS